UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BARBARA RUSSO, individually and on behalf of all others similarly situated,

    Plaintiff,

    v.

BANK OF AMERICA, N.A., a Delaware Corporation,

    Defendant.

No. 14 CV 382

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Barbara Russo obtained a home mortgage loan from Bank of America, N.A. Six years later, she received from the Bank a letter informing her that she had been approved to participate in a "trial period plan," during which she could make reduced monthly payments on her mortgage. If Russo completed the trial program successfully, she would qualify for a permanent modification of her mortgage. Russo did obtain a permanent modification of her mortgage; however, she alleges that Bank of America failed to report her on-time trial payments and subsequent post-modification payments to the credit bureaus, and thus breached both the trial-period and modification agreements.[1] Russo also alleges that, because of the Bank's breach, she lost credit opportunities and has suffered damage to her credit rating.

---

[1] Russo brings her breach-of-contract action as a putative class action. The Court has diversity jurisdiction over the putative class action because at least one plaintiff (Russo) is diverse from the defendant (Bank of America) and because the alleged amount in controversy for the class exceeds $5,000,000. *See* 28 U.S.C. § 1332(d)(2). Russo is a citizen of Illinois, and Bank of America, N.A. is a national banking association headquartered in North Carolina. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006) ("locating" a national bank in the state of its main office).

Bank of America moves to dismiss Russo's breach-of-contract claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, I grant in part and deny in part defendant's motion.

## I.  Legal Standard

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the pleading requirements set forth in Rule 8(a) is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To satisfy these "notice" pleading requirements, the complaint need not set forth detailed factual allegations. *Id.* (citation omitted). However, a "formulaic recitation of the elements of a cause of action" is insufficient. *Id.* (citing *Papason v. Allain*, 478 U.S. 265, 286 (1986)). A complaint must do more than imply a mere possibility that the defendant acted unlawfully. *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009) (citation omitted). It must present enough "factual matter, accepted as true, [that the] 'claim to relief . . . is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

Motions under Rule 12(b)(6) are meant "to test the sufficiency of the complaint, not . . . the merits" of the plaintiff's case. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n. 1 (7th Cir. 1996) (quoting *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.3d 583, 586 (7th Cir. 1989)). Accordingly, in considering a Rule 12(b)(6) motion to dismiss, I must accept as true all well-pleaded factual allegations and

draw all reasonable inferences in the plaintiff's favor. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013) (quoting *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010)).

**II.    Facts**

In 2006, Barbara Russo, a citizen of Illinois, obtained from Bank of America a home mortgage loan secured by her primary residence. [19-1] ¶¶ 5, 7.[2] Bank of America is a national banking association headquartered in North Carolina. *Id.* ¶ 6. In August 2012, the Bank sent Russo a letter informing her that she had been approved to participate in a trial period plan ("TPP"), the successful completion of which would qualify Russo for a modification of her 2006 mortgage loan. [27-2] at 2.[3] To participate in the TPP and qualify for a loan modification, Russo was required to make three on-time monthly mortgage payments at a reduced rate, and to "continue to meet all of the eligibility requirements" of the modification program. *Id.* From October to December 2012, Russo successfully made all of the required TPP payments, and she subsequently qualified for a permanent modification of her mortgage. [19-1] ¶ 9.

---

[2] Citations to the record are designated by the document number as reflected on the Court's docket, enclosed in brackets.

[3] Russo did not attach to her complaint the TPP letter or any documents related to the loan modification. However, Bank of America attached to its motion to dismiss the following: (1) the TPP letter that Russo received from the Bank, as well as its enclosures (a "Frequently Asked Questions" document, a document entitled "Additional Trial Period Plan Information and Legal Notices," and TPP payment coupons) [27-2]; and (2) a Loan Modification Agreement [27-1]. For the purposes of deciding Bank of America's motion to dismiss, I may consider any of the documents that the Bank attached to its motion that also are also "referred to in the plaintiff's complaint and . . . central to [her] claim." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). Such documents are considered part of the pleadings. *Id.*

3

Despite receiving a permanent loan modification, however, Russo alleges that Bank of America failed to meet some of its obligations under both the purported TPP contract and the loan modification agreement. According to Russo, the Bank breached both agreements by failing to report to credit agencies Russo's TPP and post-modification payments accurately. As a result, Russo was injured because she was unable to obtain another mortgage, her credit-card application was denied, her credit score decreased, and obtaining credit in general "bec[a]me more costly" for her. *Id.* ¶¶ 11–15, 28–29.[4]

## III. Analysis

### A. Choice of Law

Although this is a diversity action, neither party has affirmatively raised the choice-of-law issue. The parties have impliedly agreed that Illinois substantive law applies to Russo's suit, as each cites to Illinois law when describing the elements required for a breach-of-contract claim. *See* [27] at 4; [33] at 3. Because the parties do not dispute that Illinois law governs, and as the Court sits in the state of Illinois, it is appropriate to apply Illinois law in considering this motion. *See GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1115 n. 6 (7th Cir. 1995) (observing that "if neither party raises a conflict-of-law issue in a diversity case," the court "may apply the law of the state in which [it] sits" (citing *Employers Ins. v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 141 n. 2 (7th Cir. 1994))).

### B. Bank of America's Motion to Dismiss

---

[4] Russo brings her breach-of-contract claim as a putative class action, and alleges that the sum or value of the amount in controversy exceeds $5,000,000 for the class. [19-1] ¶ 3.

4

Bank of America moves to dismiss Russo's breach-of-contract claim as to both the alleged Trial Period Plan agreement and the subsequent loan modification agreement. [26, 27].

### *Trial Period Plan*

Under Illinois law, a plaintiff has successfully pleaded her breach-of-contract claim when she alleges the existence of "a valid contract, performance by the plaintiff, breach by the defendant, and damages." *Norem v. Lincoln Benefit Life Co.*, 737 F.3d 1145, 1148 (7th Cir. 2013) (citing *Elson v. State Farm Fire & Cas. Co.*, 295 Ill.App.2d (1995)). Here, Russo alleges that Bank of America breached a purported TPP contract by failing to report to major credit bureaus Russo's on-time loan payments made pursuant to the TPP. [19-1] ¶¶ 11, 28. According to Russo, this alleged breach resulted in a "loss of other credit opportunities" for her, *id.* ¶ 29, including denial of another home loan mortgage, denial of a credit-card application, and damage to her credit score, *id.* ¶¶ 13–14, 29. Obtaining credit in general also "has become more costly for her." *Id.* ¶ 15.

Bank of America advances four arguments why, in the Bank's estimation, Russo's complaint fails to state a proper breach-of-contract claim based on the TPP letter. For the reasons discussed below, I conclude that none of these arguments compels dismissal of Russo's complaint as it pertains to the TPP.

#### 1. *The Statute of Frauds*

Bank of America first argues that the TPP letter Russo received from the Bank cannot constitute a valid and enforceable contract—and thus cannot provide

5

the basis for a viable breach-of-contract claim—because the letter is an unsigned document that falls within the Illinois Statute of Frauds. [27] at 6 n. 5 (citing 740 ILL. COMP. STAT. 80/2). The Illinois Statute of Frauds provides that there is no cause of action for the breach of "any contract for the sale of lands, . . . or any interest in or concerning them, . . . unless such contract . . . shall be in writing, and signed by the party to be charged" with the alleged breach. 740 ILL. COMP. STAT. 80/2.[5]

The statute of frauds is an affirmative defense, *see* Fed. R. Civ. P. 8(c), and "complaints need not anticipate and attempt to plead around defenses," *United States v. Northern Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980); *United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623 (7th Cir. 2003)). The exception to this general rule is that, where a plaintiff admits in her complaint "all the ingredients of an *impenetrable* defense," she has pleaded herself out of court (and dismissal under Rule 12(b)(6) is therefore appropriate). *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (emphasis added) (citing *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002)). Here, however, the statute-of-frauds defense is not impenetrable.

As Russo herself points out, [33] at 3 n. 2, it is well-settled in Illinois that contracts that would otherwise be "unenforceable under the statute of frauds [can be enforced] if the contract has been completely performed by one party," *Kozasa v.*

---

[5] Russo counters that the TPP letter is not subject to the Statute of Frauds because the letter does not "involve the purchase of land." Rather, Russo argues, the letter concerns only "the modification of a loan." [33] at 3 n. 2. However, Russo ignores that the "loan" to be modified is Russo's original mortgage on her Illinois property—a loan involving the sale of land. But I need not determine whether the TPP letter concerns "the sale of lands," because Bank of America's statute-of-frauds argument is deficient for a different reason, as explained above.

6

*Guardian Elec. Mfg. Co.*, 99 Ill.App.3d 669, 677 (1981) (citing *David v. Schiltz*, 415 Ill. 545, 555 (1953); *Mapes v. Kalva Corp.*, 68 Ill.App.3d 362, 368 (1979); *Reiss v. El Bauer Chevrolet Co.*, 96 Ill.App.2d 266, 269 (1968)); *see also id.* ("[I]t has been the law of Illinois since [1859] that executed . . . contracts are never voided by the statute of frauds."). The TPP letter instructs Russo that, in order for her to qualify for a permanent loan modification, she must "make all trial period payments on time" and "continue to meet all of the eligibility requirements of this modification program." [27-2] at 2. Although the letter does not specify what the "eligibility requirements" are, Russo states in her complaint that she "made [the TPP] payments in full and qualified for a permanent modification" of her mortgage. [19-1] ¶ 9. Accepting these allegations as true, and drawing all reasonable inferences in Russo's favor, Russo has plausibly alleged that she fully performed her obligations under the terms of the TPP letter. Thus, Russo has not pleaded herself out of court by admitting facts sufficient to establish an "impenetrable" statute-of-frauds defense. *See Xechem*, 372 F.3d at 901.[6]

### 2. Whether the FAQ is Part of the Alleged Contract

Bank of America also argues that Russo's complaint fails to state a proper breach-of-contract claim because, even if the TPP letter were a valid contract, the language relevant to Russo's claim is not a part of that contract. The language concerning any alleged "reporting" duty is found only in the Frequently Asked

---

[6] I also note that Bank of America does not dispute in its reply brief [34] that the full-performance exception applies in this instance.

7

Questions document enclosed with the TPP letter, not in the TPP letter itself. [27] at 6–7; [34] at 3.[7]

Bank of America is correct that the TPP letter itself does not include any duty to report to credit bureaus, and that the only reference to credit reporting is found in the enclosed FAQ document. [27-2] at 5. However, the Bank neglects to provide any support for its proposition that, as a matter of law, the FAQs *cannot* be considered a part of the TPP agreement. To the contrary, there is a principle of contract law that may permit consideration of the FAQs as part of the TPP contract.

In Illinois, the parol evidence rule provides that if a writing is not a "complete and exclusive statement" of the parties' intended agreement—that is, if the writing is not completely or fully integrated—its terms "may be explained or supplemented by evidence of consistent additional terms." *Peoria Harbor Marina v. McGlasson*, 105 Ill.App.3d 723, 729 (1982); *see also Kay v. Prolix Packaging, Inc.*, 993 N.E.2d 39, 51 (Ill. App. Ct. 2013) ("[T]he parol evidence rule allows extrinsic evidence of additional and consistent terms when the contract appears incomplete or ambiguous on its face."). Whether a document constitutes a fully integrated writing is a determination that the trial court makes as a matter of law. *See Weber v. DeKalb Corp., Inc.*, 265 Ill.App.3d 512, 518 (1994) (citing *Pecora v. Szabo*, 94 Ill.App.3d 57 (1981)). In making this determination, I must follow the four-corners

---

[7] The Bank also says that the FAQs cannot be a part of the TPP contract because Russo's complaint does not refer explicitly to the FAQs (only to the TPP). [27] at 7. While it is true that Russo's complaint does not refer to the FAQs by name, the FAQs were provided to Russo as an attachment to the TPP letter, and the "reporting" language in the FAQs is central to Russo's contract claim. It is therefore reasonable to infer from Russo's complaint that its references to the "TPP Contract" impliedly include the FAQ document at issue here. As the Bank has attached the FAQ document to its motion to dismiss, that document is "considered part of the pleadings" for the purposes of deciding this motion. *188 LLC*, 300 F.3d at 735.

test: I must find "from the contract itself" that the writing is incomplete before I may admit extrinsic evidence to provide additional and consistent terms. *Id.* (quoting *Geoquest Prods. v. Embassy Home Entm't*, 229 Ill.App.3d 41, 45 (1992)).

The question here is whether the TPP letter appears on its face to be a complete expression of the parties' intended agreement. *See Peoria Harbor*, 105 Ill.App.3d at 729–30. I find that the TPP letter does not appear to be a complete expression of the parties' intent, and therefore that the TPP letter is not fully integrated as a matter of law.

First, as discussed above, the TPP letter informs Russo that to qualify for a permanent loan modification she must "continue to meet all of the eligibility requirements of this modification program." [27-2] at 2. But nowhere in the letter is it explained precisely what those requirements are.[8] The letter does refer to Russo's obligation under the TPP to "make all trial period payments on time." *Id.* But it cannot be the case that making on-time TPP payments is the sole eligibility requirement, because the on-time requirement is presented in *addition to* the "eligibility requirements" discussed here. *See id.* ("After you make all trial period payments on time, *and* if you continue to meet all of the eligibility requirements . . . , your mortgage will be permanently modified.") (emphasis added). Each provision must be given full and separate effect. *See Thompson v. Gordon*, 241 Ill.2d

---

[8] Russo alleges that she did receive a loan modification from the Bank after completing the TPP. [19-1] ¶ 9. Accepting this allegation as true, *Cincinnati Life*, 722 F.3d at 946, Russo has pleaded facts sufficient to support the inference that she did in fact "continue to meet" the unspecified eligibility requirements. Even though I may reasonably infer from her complaint that Russo satisfied all of the eligibility requirements, it is still the case that the TPP letter does not identify what the requirements are.

9

428, 442 (2011) ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless . . . ."); *Snelten v. Schmidt Implement Co.*, 269 Ill.App.3d 988, 993 (Ill. App. Ct. 1995) ("It is presumed contracting parties intend all portions of their contract to carry meaning and no portion was meant to be mere surplusage." (citing *Taber v. Taber*, 248 Ill.App.3d 435, 438 (1993))).

A reasonable inference from the face of the TPP letter is therefore that the eligibility requirements to which the letter refers, if set out in writing at all, are enumerated in a separate document—and that the written TPP agreement, lacking important details about one party's obligations under the contract, is thus an incomplete expression of the parties' intent.

Further evidence that the TPP letter is facially incomplete exists in the section of the letter entitled, "What you need to do." [27-2] at 2. This portion of the letter instructs the recipient (Russo) to "[p]lease read this letter *and the enclosed Frequently Asked Questions* so that you understand all the steps you need to take to permanently modify your mortgage." *Id.* (emphasis added). The letter, in short, quite specifically refers Russo to a separate document to understand the full breadth of her obligations under the TPP. This separate document—the FAQ enclosure—is the very same document that Bank of America contends cannot possibly be a part of the TPP contract.

Though I do not decide whether the FAQs are in fact a part of the TPP, I do find that the TPP letter itself is facially incomplete and that relevant extrinsic evidence (possibly including the FAQs) may therefore be used to clarify or

supplement the terms of the letter. Bank of America's argument that the FAQs cannot be part of the TPP therefore falls short.[9]

### 3. *The Duty to Report*

Bank of America further argues that Russo fails to state a proper breach-of-contract claim because, even assuming the TPP letter were a contract and the FAQs a part of that contract, the relevant provision does not require the Bank to report any of Russo's TPP payments to credit bureaus—and thus the Bank cannot be held liable for failing to do so. [27] at 7–8; [34] at 2–5. The pertinent FAQ provides:

> [Bank of America] will continue to report to credit reporting agencies the status of your loan as well as your entry into a Trial Period Plan, in accordance with the requirements of the Fair Credit Reporting Act and the Consumer Data Industry Association. In addition, your loan will be reported as paying under a partial or modified payment plan during the trial period.

[27-2] at 5.

Bank of America contends that because the above provision says, "in accordance with the requirements of the Fair Credit Reporting Act and the Consumer Data Industry Association," the Bank has no reporting obligations whatsoever under the terms of the FAQ. This is so, argues the Bank, because neither the Fair Credit Reporting Act (FCRA) nor the Consumer Data Industry

---

[9] In response to the Bank's contention that the FAQs are not part of the TPP agreement, Russo argues that the two writings must be construed as a single instrument because they were executed at the same time and for the same purpose, and because the TPP letter incorporates the FAQs by reference. [33] at 4–5. I do not reach these arguments, however, as my determination that the TPP letter is not fully integrated—and that the FAQs may possibly comprise relevant parol evidence—obviates any need to explore them. On the other hand, I do note that while Bank of America denies that Russo's "executed at the same time" theory is sound, the Bank does not address (and thus does not appear to dispute) Russo's argument that the TPP letter incorporates the FAQs by reference. *See* [34] at 3 n. 1.

11

Association (CDIA) affirmatively imposes on entities such as the Bank an independent requirement to report any credit information at all.[10] [27] at 7–8; [34] at 4. While Russo does not dispute that neither FCRA nor the CDIA independently requires the Bank to report her loan information,[11] she argues that additional language in the FAQ—language providing that Bank of America will "continue to report" to credit agencies the status of Russo's loan—does create such an obligation. [33] at 6–7.

In Illinois, the court must interpret a contract first "by examining the language of the contract alone." *Matthews v. Chicago Transit Authority*, 9 N.E.3d 1163, 1188 (Ill. App. Ct. 2014). Unambiguous words are construed according to their "plain, ordinary and popular meaning." *Thompson*, 241 Ill.2d at 441 (citing *Cent. Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141 (2004)). If the language of the contract is facially unambiguous, the court interprets the contract as a matter of law, without the use of parol evidence. *Matthews*, 9 N.E.3d at 1188 (citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462 (1999)). Only where there is ambiguity may the court admit extrinsic evidence in an effort to resolve that ambiguity. *Id.* (citing *Air Safety*, 185 Ill.2d at 462–63). Language is not necessarily ambiguous merely because the parties disagree about the correct interpretation. *See Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1138 (7th Cir. 2001) (citing

---

[10] FCRA and CDIA reporting rules, in other words, provide the "how" of reporting credit information—not whether the information must be reported in the first place.

[11] Russo agrees that the CDIA does not independently require Bank of America to report consumer data to the credit bureaus, and does not take a position as to whether FCRA independently imposes such a duty (because, according to Russo, she does not make that claim). *See* [33] at 7 n. 4.

12

*Pennsylvania Life Ins. Co. v. Pavlick*, 265 Ill.App.3d 526 (1994)). However, ambiguity is present where "the language of the contract is susceptible to more than one meaning." *Thompson*, 241 Ill.2d at 441 (citing *Gallagher v. Lenart*, 226 Ill.2d 208, 233 (2007)); *see also Thomas*, 251 F.3d at 1137–38 (similar).

For the purposes of this discussion, I assume (but do not decide) that the relevant "contract" to be examined comprises the TPP letter and FAQ document originally enclosed with the letter.[12] The FAQ document provides that Bank of America "will continue to report to credit reporting agencies" the status of Russo's loan "in accordance with the requirements of" FCRA and the CDIA. [27-2] at 5. I also assume (as the parties agree) that neither FCRA nor the CDIA independently obligates Bank of America to report loan information to the credit bureaus. Based on these assumptions, I find that there are at least two reasonable interpretations of the FAQ provision.

One plausible interpretation of the provision is that Bank of America previously agreed (*i.e.*, before Russo received her TPP letter) to report to the credit bureaus Russo's loan information, and that the Bank is now—through the FAQ—agreeing to "continue" to report that same type of information. Under this construction, the "in accordance with" language signifies that Bank of America's "continued" reporting will be carried out—now, just as it was previously—in a manner that complies with any applicable FCRA or CDIA rules. This interpretation would effectively impose upon Bank of America a duty to report at least some of

---

[12] As explained above, the FAQs *may* constitute parol evidence that potentially could be used to clarify or supplement the terms of the TPP letter.

13

Russo's loan information to the credit reporting agencies, and is similar to the interpretation that Russo advances.

The above interpretation is not the only plausible one, however. Again looking only to the face of the contract, another reasonable interpretation of the FAQ provision—one more in line with the construction that Bank of America urges—is that the Bank in fact made no prior commitment to report Russo's loan information; rather, to the extent the Bank *chose* to report such information in the past, it did so "in accordance with" any relevant FCRA or CDIA rules. Under this alternative construction, Bank of America agrees through the FAQ only that, to the extent the Bank now chooses to report to the credit bureaus any new loan information (such as information about Russo's TPP payments) the Bank will "continue" to follow applicable FCRA and CDIA reporting rules. This construction, in contrast to the one discussed above, would *not* impose on Bank of America any duty to report Russo's loan information.

Because the contract is susceptible to more than one meaning, it is ambiguous on its face. *See, e.g.*, *Thompson*, 241 Ill.2d at 441; *Thomas*, 251 F.3d at 1137. Indeed, even if there were only one plausible meaning of "continue to report," the FAQ would still be ambiguous because it is unclear from the face of the contract what is meant by "the status of your loan." Neither the TPP letter nor the FAQ document sheds light on whether "the status of your loan" includes, for example,

information about Russo's individual loan payments—and if so, whether such information would also include the timeliness of those payments.[13]

I cannot resolve these ambiguities, as a matter of law, at the motion-to-dismiss stage. *See Dawson v. General Motors Corp.*, 977 F.2d 369, 373 (7th Cir. 1992) ("If the language of an alleged contract is ambiguous . . . , the interpretation of the language is a question of fact [that the trial court] cannot properly determine on a motion to dismiss." (quoting *Quake Constr., Inc. v. Am. Airlines, Inc.*, 141 Ill.2d 281 (1990))). Extrinsic evidence is needed to clarify the parties' intent as to the meaning of the FAQ. *See Matthews*, 9 N.E.3d at 1188 ("If an ambiguity is present, then the court may admit parol evidence to aid in resolving the ambiguity.") (citation omitted).

    *4.    Damages*

Finally, Bank of America argues that even if the Bank were required to report Russo's TPP payments to the credit bureaus, Russo's complaint must still be dismissed because Russo was not damaged by the Bank's failure to report that information. [27] at 9. Bank of America maintains that Russo could not possibly have been damaged by a failure to report her TPP payments because, as the FAQs explain, borrowers participating in a TPP program are reported as under that program, and such a report would reveal Russo to be an increased credit risk. *Id.* (citing the FAQs, [27-2] at 5); *see also* [34] at 6–7.

---

[13] I note that the contract may also contain ambiguities other than those discussed here. I do not analyze other provisions of the contract, however, as the ambiguities addressed above are sufficient to allow Russo's case to advance past the pleading stage.

15

I disagree. Russo alleges that the Bank's failure to report her "*on-time* payments to the major credit bureaus," [19-1] ¶ 11 (emphasis added), has resulted in a lower credit score and inability to obtain other loans, *id.* ¶¶ 13–15, 29.[14] Even assuming that Russo's entry into the TPP program would have had an adverse impact on her credit, Bank of America does not explain why Russo's credit could not have suffered a *further* detriment when the Bank failed to report that her TPP payments were made on time.[15]

Bank of America contends in the alternative that Russo fails to allege actual damages because "lost credit opportunities" of the type described in her complaint are not cognizable injuries that can support a breach-of-contract claim. *See* [27] at 9 n. 9; [34] at 7 n. 4. Not so. *See Fletcher v. OneWest Bank, FSB*, 798 F.Supp.2d 925, 932 (N.D. Ill. 2011) (determining that, under Illinois law, the plaintiff had "alleged damages for her breach of contract claim" by asserting "damages in the form of fees, charges, accrued interest, and *damage to her credit reports*") (emphasis added); *Hickman v. Wells Fargo Bank N.A.*, 683 F.Supp.2d 779, 791 (N.D. Ill. 2010) (concluding that, under Illinois law, the plaintiff had "alleged sufficient facts to

---

[14] Bank of America disputes that Russo's payments were in fact made on time. *See* [34] at 6. For the purposes of this motion, however, I must take Russo's allegations as true and assume that she did indeed make timely payments.

[15] Bank of America further argues that Russo's TPP payments were not technically "in-full" payments and thus could not have improved Russo's credit score even if reported. [34] at 6. This argument is beside the point. Nowhere in Russo's complaint does she allege that she was injured because her credit score did not *improve*. Rather, Russo alleges that her credit rating was "adversely affected" by the Bank's failure to report her payments. [19-1] ¶ 15; *see also id.* ¶ 29 ("This failure to accurately report payments caused Plaintiff direct damages, including adversely impacting Plaintiff's credit score . . . ."). As I must draw all reasonable inferences from the complaint in Russo's favor, I conclude that the "adverse impact" Russo describes in her complaint is a lowering of her credit rating from where it otherwise would have stood—not that her credit rating would have *increased* but for Bank of America's failure to report her TPP payments.

16

make his breach of contract claim plausible" by asserting that the defendant's breach, *inter alia*, denied plaintiff the "full use of their bargained for credit limits and negatively affect[ed] their credit scores").[16]

Bank of America also glosses over the portion of Russo's complaint in which she alleges that, as a result of the Bank's purported breach, "obtaining credit has become more costly" for her. [19-1] ¶ 15. I may reasonably infer from this allegation that, because the Bank failed to report Russo's loan information to credit bureaus, she must now pay higher interest rates on the loans that she does obtain—an "actual" cost to Russo. Thus, Bank of America's argument that Russo has not pleaded actual damages is unpersuasive.

For the reasons discussed above, Bank of America's motion to dismiss Russo's claim as to the TPP agreement is denied.

### *Loan Modification Agreement*

Bank of America also moves to dismiss Russo's breach-of-contract claim as it relates to the loan modification agreement that Russo obtained after completing the TPP program. [27] at 5–6. As Russo has withdrawn her allegations "relating to the (post-TPP) permanent modification period," [33] at 1 n. 1, Bank of America's motion to dismiss is granted insofar as it pertains to the loan modification agreement.

## IV. Conclusion

---

[16] Bank of America asserts that courts "routinely find" that a loss of credit or the inability to obtain a loan does not constitute an "actual damage" on which plaintiffs can generally recover, citing to two cases in support. [34] at 7 n. 4; *see also* [27] at 9 n. 9. But in neither case did the deciding court apply Illinois law.

17

For the reasons discussed above, defendant's motion to dismiss is granted in part and denied in part. The motion is granted as it pertains to Russo's allegations concerning a breach of her permanent loan modification agreement. The motion is denied as it pertains to Russo's allegations concerning a breach of the TPP agreement.

ENTERED:

                                                Manish S. Shah
                                                United States District Judge

Date: 8/1/14